**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE WOLK LAW FIRM, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 19-1401(TJS) |
| | : | |
| UNITED STATES OF AMERICA | : | |
| NATIONAL TRANSPORTATION | : | |
| SAFETY BOARD, | : | |
| | : | |
| Defendant. | : | |

**O R D E R**

AND NOW, this          day of          , 2020, upon consideration of defendant's

Motion for Summary Judgment and plaintiff's response thereto, it is hereby ORDERED that the

motion is GRANTED. Summary judgment is entered in favor of the defendant and against the

plaintiff, and the case is closed.

BY THE COURT:

_____

HONORABLE TIMOTHY J. SAVAGE
*Judge, United States District Court*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE WOLK LAW FIRM, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 19-1401(TJS) |
| | : | |
| UNITED STATES OF AMERICA | : | |
| NATIONAL TRANSPORTATION | : | |
| SAFETY BOARD, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant, the National Transportation Safety Board ("NTSB"), moves for summary judgment in its favor because the agency has satisfied its obligations under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and this case may be closed.

Plaintiff's Amended Complaint against the NTSB, filed on June 3, 2019, asserted claims of (1) obstruction of justice and violation of due process in Count I; (2) violation of 14 C.F.R. § 837.4 in Count II; and (3) violation of the FOIA in Count III. Plaintiff sought to compel the NTSB to propel it to the head of a waiting list and immediately provide documents and other materials plaintiff asked for in FOIA requests relating to several NTSB aircraft accident investigations.

On October 10, 2019, the Court dismissed Counts I and II of the Amended Complaint, (Doc. #23), which left remaining only plaintiff's claim of a FOIA violation in Count III. That same day, the Court granted the NTSB's motion to stay this action through April 2020, pursuant to 5 U.S.C. § 552(a)(6)(C), to allow the agency to respond to plaintiff's pending at-issue FOIA

requests on a rolling basis as they reached the top of the agency's first-in, first-out queue. (Doc. # 24.)

The NTSB has satisfied its obligations under the FOIA, and now seeks summary judgment as a matter of law. The NTSB has responded to plaintiff's FOIA requests, and properly withheld or redacted records in accordance with applicable FOIA exemptions. Accordingly, the Court should grant summary judgment in favor of the NTSB. The bases for this motion are set forth in more detail in the attached memorandum of law.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney


/s/ Gerald B. Sullivan, for
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

/s/ Stacey L. B. Smith
STACEY L. B. SMITH
Assistant United States Attorney
United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Dated:    October 30, 2020

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE WOLK LAW FIRM,            :
                                     :
                Plaintiff,     :
                                     :
            v.             :       Civil Action No. 19-1401(TJS)
                                     :
UNITED STATES OF AMERICA   :
NATIONAL TRANSPORTATION   :
SAFETY BOARD,             :
                                     :
               Defendant.    :

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, the National Transportation Safety Board ("NTSB"), submits this memorandum of law in support of its motion for summary judgment.

## I.   STATEMENT OF FACTS

### A.   The NTSB's responsibilities.

The NTSB is the federal agency responsible for investigating every civil aviation accident and incident in the United States (about 1,675 annually), and significant accidents in other modes of transportation, such as railroad, highway, marine, and pipeline. Ex. 2, Declaration of Timothy LeBaron ¶ 4. The NTSB determines the probable cause of accidents and issues safety recommendations aimed at preventing future accidents and incidents. *Id.* ¶ 5.

NTSB regulations require that certain information relevant to an accident be placed in a public docket. *Id.* ¶ 6; 49 C.F.R. § 845.31. This includes NTSB investigators' factual reports, transcripts of interviews and hearings, relevant correspondence, supporting documents, photographs, and videos. Ex. 2 ¶ 6. For aviation accidents, the NTSB Board's preliminary and final

accident reports (also known as the "probable cause finding") are published in the Aviation Accident Database on the NTSB's website. *Id.* ¶ 6.

The public docket will not contain medical records or other records implicating privacy concerns, such as accident scene photographs involving human remains. *Id.* ¶ 7. Furthermore, the public docket will not contain confidential or commercially sensitive information unless the NTSB has given the owner of such information notice and an opportunity to comment pursuant to the procedures described in 49 C.F.R. § 831.6. Ex. 2 ¶ 7; *see also* 49 U.S.C. § 1114(b)(1)(D). Nor will deliberative process information be released to the public. Ex. 2 ¶ 7. Generally, the NTSB will release the public docket at or near the conclusion of an investigation. *Id.*

In addition, the NTSB conducts special studies concerning transportation safety and coordinates the resources of the federal government and other organizations to provide assistance to victims and their family members impacted by major transportation disasters. Ex. 2 ¶ 4.

**B.      NTSB investigations and the use of technical expertise from other organizations and government agencies.**

NTSB investigations are fact-finding proceedings with no adverse parties. 49 C.F.R. § 831.4(c); Ex. 2 ¶ 5. They are not adjudications and are not conducted to determine the rights, liabilities, or blame of any person. *Id.* They result in a report on the facts, circumstances, and probable cause of an accident, and safety recommendations designed to prevent future accidents. 49 U.S.C. §§ 1116, 1131(e); 49 C.F.R. § 831.4(a)–(b); Ex. 2 ¶ 5. The NTSB is authorized to subpoena witnesses and evidence for an investigation; to enter and inspect facilities where an accident occurred, or where evidence related to an accident is kept; and to examine and test wreckage and property. 49 U.S.C. §§ 1113(a), 1134; 49 C.F.R. § 831.9(a); Ex. 2. ¶ 8. The NTSB

may retain control over wreckage, records, and property until the conclusion of an investigation. 49 C.F.R. § 831.12; Ex. 2 ¶ 8.

NTSB aviation accident investigators come from various aviation backgrounds. Ex. 2 ¶ 8. But they cannot reasonably be expected to maintain comprehensive knowledge about each of the airframes, engines, systems, components, and specifications of every civil aircraft flown in the United States. *Id.* Thus, the NTSB enlists the assistance of other organizations and government agencies to assist in conducting its investigations. 49 C.F.R. § 831.11(a); Ex. 2 ¶ 9. In each accident investigation, the NTSB Investigator-in-Charge ("IIC") designates as "parties" to the investigation "those persons, federal, state, or local government agencies and organizations whose employees, functions, activities, or products were involved in the accident and that can provide suitable qualified technical personnel to actively assist in an investigation." 49 C.F.R. § 831.11(a); Ex. 2 ¶ 9. A party's participation is subject to the IIC's direction and control. 49 C.F.R. §§ 831.8(b); 831.11(a)(4); Ex. 2 ¶ 10. A party representative from a private organization must sign the "Statement of Party Representative to NTSB Investigation," 49 C.F.R. § 831.11(d), which is also known as the "Certification of Party Representative." Ex. 2 ¶ 10. This form outlines the party's roles and responsibilities, and emphasizes, among other things, that a party's participation "is to assist the NTSB safety investigation and not for the purposes of preparing for litigation." Ex. 3, Statement of Party Representatives to NTSB Investigation, at 1.

Participation in an NTSB investigation is voluntary, and NTSB regulations provide that, except for the FAA in civil aircraft accidents, no person has a right to be a party. 49 C.F.R. § 831.11(a)(2); Ex. 2 ¶ 12. The following persons are prohibited from serving as party representatives: legal professionals; claimant or insurer representatives; and, to the extent

practicable, individuals directly involved in an accident. 49 C.F.R. § 831.11(a)(1), (b)(1); Ex. 2 ¶ 12.

Accidents involving stakeholders outside of the United States may implicate an international treaty known as the Convention on International Civil Aviation ("Convention"), 61 Stat. 1180 (entered into force April 4, 1947.) Ex. 2 ¶ 13. Among other things, that treaty, at Article 43, created an organization called the International Civil Aviation Organization ("ICAO"), which periodically adopts uniform international standards on accident investigations and other matters. Convention art. 37(k); Ex. 2 ¶ 13. ICAO's accident investigation standards appear in its "Annex 13." Under Annex 13, certain States—specifically, those where: the aircraft is registered; the aircraft operator is from; and the aircraft is designed and manufactured—have the right to appoint an accredited representative to participate in the investigation, as well as technical advisors to assist the accredited representative. ICAO Annex 13, ¶¶ 5.18-5.19; Ex. 2 ¶ 13. Such advisers must be permitted, under and subject to the accredited representatives' supervision, to participate effectively in the investigation. ICAO Annex 13, ¶ 5.24.1; Ex. 2 ¶ 13. Any participation by such representatives and advisors must be done "under the control of" the NTSB IIC. ICAO Annex ¶ 5.25; Ex. 2 ¶ 13.

An NTSB regional office investigated each accident at issue in this case. Ex. 2 ¶ 14. In aircraft accident investigations, the NTSB routinely appoints party representatives from the airframe manufacturer; the engine manufacturer; other significant component manufacturers; and, if the flight was for-hire, the commercial operator. *Id.* ¶15.

Each party must provide to the NTSB IIC information about the accident and activities conducted in connection with the accident. 49 C.F.R. § 831.13(b); Ex. 2 ¶ 11. In a regional office

investigation, such as those at issue here, the IIC typically travels to the scene of a fatal accident and, during the investigation, may arrange an examination of the wreckage. Ex. 2 ¶ 16. Party representatives may: meet the NTSB IIC at the scene of the accident; assist in the on-scene phase of the investigation; and thereafter participate in investigative activities with NTSB staff, such as aircraft examinations, witness interviews, and cockpit recorder or flight data recorder readouts. *Id.* ¶¶16-21. Additionally, party representatives provide technical review and comments on NTSB draft factual reports before the NTSB conducts its final independent analysis of an accident. 49 C.F.R. § 831.14; Ex. 2 ¶ 23. Parties such as aircraft and engine manufacturers also provide access to examination and testing facilities, equipment, and procedures unique to the aircraft or engine involved in the accident. Ex. 2 ¶ 22.

The investigative process depends on those involved being able to talk openly and freely without fear of public scrutiny. *Id.* ¶ ¶ 26-28. Possible accident scenarios are discussed during the on-scene investigation. *Id.* ¶¶ 26-27. These scenarios will be confirmed or disconfirmed during further investigation. *Id.* It is critical to the NTSB's safety mission to maintain an atmosphere where open dialogue is welcome and protected. *Id.* ¶¶ 26-28. If not, this will have an adverse impact on aviation safety moving forward. *Id.* ¶ 28. The declaration of Timothy LeBaron, Deputy Director for Regional Office Operations in the NTSB Office of Aviation Safety, further describes parties' roles and responsibilities.

### C. Plaintiff's FOIA requests.

Plaintiff's Amended Complaint describes eighteen FOIA requests it submitted to the NTSB relating to twelve aircraft accident investigations: (1) the "Bates/Cullen" accident; (2) the "Byrd" accident; (3) the "Chase" accident; (4) the "Farrar" accident; (5) the "Gentry" accident; (6) the "Gordon" accident; (7) the "Hinkle/Skinner" accident; (8) the "McCall" accident; (9) the

"Torres" accident; (10) the "O'Neal" accident; (11) the "Gill" accident; and (12) the "Shalloway" accident. Doc. # 9. The FOIA requests sought, in essence, all records in the NTSB's possession relating to the twelve aircraft accident investigations. Doc. # 17 ¶¶ 13-22.

For some accident investigations, plaintiff submitted multiple similar, if not identical, FOIA requests because plaintiff's initial requests were premature. *Id.* For example, pursuant to applicable FOIA exemptions, the NTSB denied and administratively closed plaintiff's initial FOIA requests for the Bates/Cullen, Chase, Gentry, and Torres accidents because the NTSB and law enforcement investigations were pending at the time of the requests. *Id.* When the investigations for the Chase, Gentry, and Torres accidents concluded and the NTSB released information on its website, plaintiff resubmitted FOIA requests for records in addition to what the NTSB had made public. *Id.* For those resubmitted requests, the NTSB assigned positions in the FOIA Office's "first-in, first-out queue." *Id.* Plaintiff never resubmitted a FOIA request for additional records relating to the Bates/Cullen accident following conclusion of that investigation and the NTSB's publication of records on the website.

### D. The NTSB's responses.

On October 10, 2019, the Court granted the NTSB's motion to stay this matter pursuant to the FOIA, 5 U.S.C. § 552(a)(6)(C). Doc. #24. The Order allowed the agency to process plaintiff's pending, at-issue FOIA requests on a rolling basis as they reached the top of the NTSB's first-in, first-out queue—a timeline in compliance with FOIA. *See* 5 U.S.C. § 552(a)(6)(C). On May 4, 2020 the NTSB informed the Court that the agency had responded to each of plaintiff's pending FOIA requests. Doc. #28.

Since the May 4, 2020 status report, the NTSB has produced, on a rolling basis, additional records responsive to plaintiff's pending FOIA requests. These records were initially withheld under FOIA exemptions from disclosure, but later deemed releasable. In particular, the NTSB—in reliance upon plaintiff's September 29, 2020 letter identifying its clients—has agreed to release many of the records initially withheld based on privacy considerations. It is the agency's understanding that plaintiff, a law firm, represents the estates and representatives of the individuals to whom many of the records being produced pertain and that plaintiff has permission from its clients to access these records.

Plaintiff's remaining claim in Count III of the Amended Complaint is based on the NTSB's alleged violations of the FOIA. The NTSB, however, has responded appropriately to each pending request identified in the Amended Complaint. The NTSB has made thousands of responsive pages available to plaintiff—either by informing plaintiff that responsive records were published on the NTSB's website in accordance with agency regulations, or by producing responsive, nonprivileged records not already on the website directly to plaintiff in response to the FOIA requests. Where appropriate under a FOIA exemption from disclosure, the NTSB either redacted information or withheld records in full. The FOIA requires that "any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt," 5 U.S.C. § 552(b).

Plaintiff has confirmed that, in light of the NTSB's responses, plaintiff's FOIA requests for the following five aircraft accident investigations identified in the Amended Complaint are no longer at issue: (1) the "Byrd" accident; (2) the "Farrar" accident; (3) the "Hinkle/Skinner"

accident; (4) the "McCall" accident; and (5) the "Gill" accident. As such, summary judgment should be granted to the NTSB for these five accident investigations.

The FOIA exemptions from disclosure applicable to the redacted or withheld records for the remaining six investigations still at issue[1] are: (1) 5 U.S.C. § 552(b)(4) ("Exemption 4"), which exempts from disclosure records concerning trade secrets and confidential commercial information; (2) 5 U.S.C. § 552(b)(5) ("Exemption 5"), which exempts from disclosure records protected by various privileges, including the deliberative process privilege and attorney-client privilege; and (3) 5 U.S.C. § 552(b)(6) ("Exemption 6"), which exempts from disclosure records implicating personal privacy.[2]

The NTSB seeks summary judgment because it has complied with the FOIA. In support of this motion, the NTSB has created an index of the redacted and/or withheld records.[3] (Ex. 1, Index of Withheld Records.)

---

[1] There appear to be six, not seven, of the original twelve investigations that remain at issue, because, as discussed more fully below, it is unclear whether, and on what basis, the Bates/Cullen accident investigation remains at issue in light of the averments in the Amended Complaint and plaintiff's failure to submit a FOIA request to the NTSB seeking records beyond those that the NTSB has made publicly available since the conclusion of the investigation.

[2] The NTSB determined that some records responsive to plaintiff's FOIA requests originated at, or were controlled by, the FAA. The NTSB appropriately referred the requests for those records to the FAA to contact plaintiff directly regarding disclosure. *See e.g.*, *Sussman v. U.S. Marshals Service*, 494 F.3d 1106 (D.C. Cir. 2007); *Inst. for Pol'y Stud. v. CIA*, 885 F. Supp 2d 120, 241 (D.D.C. 2012); *El Badrawi v. DHS*, 583 F. Supp. 2d 285, 310 (D. Conn. 2008). The FAA has represented to the NTSB that it has released the records to plaintiff.

[3] Such an index in FOIA cases has also been referred to as a "*Vaughn* Index." *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

II.      **THE STANDARD FOR SUMMARY JUDGMENT IN A FOIA CASE**

The FOIA's purpose is "to facilitate public access to government documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *see also Manna v. U.S. Dep't of Justice*, 51 F.3d 1158, 1163 (3d Cir. 1995). "The statute is designed to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Ray*, 502 U.S. at 173, *quoting Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). The Supreme Court has observed that, under the FOIA, there is a "strong presumption in favor of disclosure." *Rose*, 425 U.S. at 360-61 (statute reflects "a general philosophy of full agency disclosure," and "disclosure, not secrecy, is the dominant objective of the Act".)

"Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). *Sheet Metal Workers Int'l Ass'n, Local Union 19 v. U.S. Dep't of Veterans Affairs*, 135 F.3d 891, 897 (3d Cir. 1998) (noting that public access to government information is not "all encompassing".) Thus, the FOIA specifically exempts nine categories of records from its broad disclosure requirements. 5 U.S.C. § 552(b). *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). These exemptions are designed "to balance the public's interest in governmental transparency against the 'legitimate governmental and private interests [that] could be harmed by the release of certain types of information.'" *United Techs Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010) (quoting *Critical Mass Energy Project v. Nuclear Reg. Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (*en banc*). *See John Doe Agency v. John Doe Corp*., 493 U.S. 146, 152 (1989) (FOIA is intended to strike "a workable balance between the right of the public to know and the need of the Government to keep information in confidence".) Courts have emphasized that the FOIA exemptions "'are intended to have meaningful reach and application'

9

and should not 'be construed in a nonfunctional way.'" *Manna*, 51 F.3d at 1163, *quoting John Doe Agency*, 493 U.S. at 152, 157.

       To succeed on a FOIA claim, a plaintiff must prove that an agency *improperly* withheld an agency record. *United States v. Tax Analysts*, 492 U.S. 136, 142 (1989). Summary judgment is the procedure by which courts resolve nearly all FOIA cases. *See, e.g.*, *Samahon v. U.S. Dep't of Justice*, No. 13-6462, 2015 WL 857358, at *5 (E.D. Pa. Feb. 27, 2015). In a FOIA case, "the burden is on the agency to sustain its action" in withholding records under the exemptions. 5 U.S.C. § 552(a)(4)(B). *See Ray*, 502 U.S. at 173 ("[t]he strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents".)

       The agency can sustain its burden under the FOIA through a submission "describing the material withheld and detailing why it fits within the claimed exemption." *McDonnell v. United States*, 4 F.3d 1227, 1241 (3d Cir. 1993). The precise form of the agency's submission—whether it be a "*Vaughn*" index, declaration, affidavit, narrative, or some combination—is immaterial, so long as the nature of the withheld information and grounds for withholding are adequately attested to by the agency. *See Hornbeck v. U.S. Coast Guard*, No. 04-1724, 2006 WL 696053, at *6 (D.D.C. Mar. 20, 2006); *see also Ctr. for Biological Diversity v. United States EPA*, 369 F. Supp. 3d 128, 134 (D.D.C. 2019) (agency can submit a "*Vaughn* Index and/or accompanying affidavits or declarations"); *Judicial Watch, Inc*., 449 F.3d at 146 (stating that an agency may "submit other measures in combination with or in lieu of the index itself," such as supporting affidavits, or seek in camera review of the documents); *Wishart v. Comm'r,* No. 98-17248, 1999 WL 985142, at *1 (9th Cir. Oct. 27, 1999) (suggesting that *Vaughn* index is unnecessary if declarations are detailed enough.)

The agency is entitled to summary judgment in a FOIA case if the agency's submissions:
(1) "describe the withheld information and the justification for withholding with reasonable
specificity, demonstrating a logical connection between the information and the claimed
exemption"; and (2) "are not controverted by either contrary evidence in the record or bad faith."
*Manna*, 51 F.3d at 1163-64, *quoting Am. Friends Serv. Comm. v. Dep't of Defense*, 831 F.2d
441, 444 (3d Cir. 1987). *See Am. Civil Liberties Union of N.J. v. FBI*, 733 F.3d 526, 531 (3d Cir.
2013).

Although the district court reviews *de novo* the agency's use of a FOIA exemption to
withhold documents, 5 U.S.C. § 552(a)(4)(B)*, see Reporters Comm. for Freedom of the Press*,
489 U.S. at 755, the agency's submissions enjoy "a presumption of good faith." *Samahon*, 2015
WL 857358, at *5. *See Andela v. Admin. Office of U.S. Courts*, No. 13-0865, 2014 WL 695209,
at *2 (E.D. Pa. Feb. 21, 2014) ("The court should not question the veracity of the agency's
submissions explaining the reason for its nondisclosure unless there is evidence of bad faith"),
*aff'd*, 569 F. App'x 80 (3d Cir. 2014); *Lewis v. U.S. EPA*, No. 06-2660, 2006 WL 3227787, at *6
(E.D. Pa. Nov. 3, 2006) ("a district court must accord affidavits submitted by an agency a
presumption of good faith") (citations omitted.) Ultimately, "the agency's justification is
sufficient if it appears logical and plausible." *ACLU v. U.S. Dep't of Def.*, 901 F.3d 125, 133-34
& n.9 (2d Cir. 2018).

## III.   THE NTSB PROPERLY WITHHELD OR REDACTED DOCUMENTS IN ACCORDANCE WITH APPLICABLE FOIA EXEMPTIONS.

### A.   The NTSB properly invoked Exemption 4.

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial
information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The

terms "financial" and "commercial" as used in FOIA "are to be given their ordinary meanings." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002). This means that "information is commercial under this exemption if, in and of itself, it serves a commercial function or is of a commercial nature." *Id.* (internal quotation marks and citation omitted). Unlike other types of information, materials implicating Exemption 4 are generally procured from third parties, rather than developed within the agency. *Judicial Watch v. FDA*, 449 F.3d 141, 148 (D.C. Cir. 2006). Protection from disclosure is available regardless of whether the information pertains to the commercial interests of the party that provided it, or to the commercial interests of another. *See, e.g.*, *Miami Herald Publ'g Co. v. SBA*, 670 F.2d 610, 614 & n.7 (5th Cir. 1982).

Although the NTSB must always exercise great care before releasing records, this is particularly true with respect to trade secret and confidential commercial information because the "[w]rongful disclosure of information protected under Exemption 4 [of the FOIA] can . . . lead to criminal liability for an agency under . . . 18 U.S.C. § 1905." *OSHA Data/CIH, Inc. v. U.S. Dep't of Labor*, 220 F.3d 153, 162 n.23 (3d Cir. 2000); *see also Jerome Stevens Pharma., Inc. v. FDA*, 402 F.3d 1249, 1255-56 (D.C. Cir. 2005) (holding that plaintiff's "complaint sufficiently allege[d] claims for misappropriation of trade secrets" under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, where the complaint alleged that FDA disclosed plaintiff's trade secrets in violation of statutes including 18 U.S.C. § 1905 and 21 U.S.C. § 331(j)).

Last year, the Supreme Court addressed the definition of "confidential" under Exemption 4. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2360 (2019). The Court criticized the prior leading test, set forth in *National Parks & Conservation Association v. Morton,* 498

12

F.2d 765 (D.C. Cir. 1974), as too constricting, and lacking basis in the ordinary meaning of the term "confidential." *Food Mktg. Inst.* at 2362-66. The Court eliminated the *National Parks* requirement that an agency show that disclosure would either: (1) impair the government's ability to obtain necessary information in the future; or (2) cause substantial competitive harm. *See National Parks*, 498 F.2d at 770. Abrogating the *National Parks* test, the Supreme Court adopted a more straightforward test. To qualify as "confidential" within the meaning of Exemption 4, commercial or financial information communicated to the government has to be "customarily kept private, or at least closely held, by the person imparting it." *Food Mktg. Inst.*, 139 S. Ct. at 2363. The Court noted that for Exemption 4 to apply, a second condition might also be required—that the information "was provided to the government under an assurance of privacy." *Id.* The Court refrained from deciding whether that second condition was required, because it found the condition satisfied in the case before it. *Id.*

The NTSB properly invoked Exemption 4 to withhold information that, if released, would reveal confidential: (1) aircraft component specifications—such as in drawings, work requests, inspection reports, manuals, and technical data; and (2) financial information such as prices on work invoices. Ex. 1. Plaintiff has represented that it does not anticipate objecting to the NTSB's Exemption 4 redaction (as identified in the *Vaughn* index) of prices on work invoices. Thus, the NTSB does not address the propriety of those redactions, and requests summary judgment in its favor for those redactions. The NTSB reserves the right, however, to support those redactions in its reply brief in the event plaintiff does oppose them.

Focusing on the documents otherwise withheld or redacted under Exemption 4, the NTSB believes that plaintiff, upon review of the *Vaughn* index, will not contest the commercial

13

nature of the information[4] or the fact that "persons" (within the meaning of FOIA) provided the

information to the NTSB.[5] Thus, this motion focuses only on demonstrating that the withheld

information is confidential. The agency reserves the right to address the additional elements of

Exemption 4 in its reply brief if necessary.

The markings on the records containing information withheld under Exemption 4 are

evidence that the records are customarily and actually kept private. *See Food Mktg. Inst.*, 139 S.

Ct. at 2363. Those records were provided to the NTSB with markings such as "confidential,"

"not for public release," "proprietary," "furnished in strict confidence," "subject to FOIA

exemption from disclosure," "subject to the Export Administration Regulations" ("EAR"),

and/or "subject to the International Traffic in Arms Regulations" ("ITAR").[6] *See* Ex. 1 (records

designated as subject to FOIA Exemption 4 in NTSB index). As stated in the *Vaughn* index,

where the information was segregable, the NTSB published redacted versions of these records on

---

[4] Courts have given the term "commercial" its ordinary meaning. Thus, "[t]he exemption reaches broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency." *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).

[5] *See Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996) (noting that 5 U.S.C. § 551(2) defines a "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency".)

[6] The Export Administration Regulations (15 C.F.R. Parts 730–774) limit foreign parties' access to goods and technology that: (1) could make a significant contribution to the military potential of other countries; (2) could prove detrimental to the national security of the United States; or (3) are contrary to the foreign policy of the United States. *See generally*, *United States v. Singer*, 963 F.3d 1144, 1149 (11th Cir. 2020). Goods and technology subject to these EAR restrictions are on the Commerce Control List, published at 15 C.F.R. Part 774, Supp. No. 1. The International Traffic in Arms Regulations, 22 C.F.R. Parts 120-130, ("ITAR") imposes similar restrictions on foreign access to goods and technology.

the public docket in accordance with the FOIA, but is withholding the unredacted versions. *See* 5 U.S.C. § 552(b).

The Supreme Court did not address whether the government must also show that it provided an assurance of privacy to the supplier before the withheld information can be considered confidential under Exemption 4. Nonetheless, the NTSB satisfies this prong. Although the NTSB, like any federal agency, may need to disclose information pursuant to FOIA or as otherwise required by law, the mere possibility that information may be disclosed for such reasons is insufficient to preclude the application of Exemption 4. *Friends of Animals v. Bernhardt*, No. Civ. A. 19-CV-01443, 2020 WL 2041337, at *11 (D. Colo. Apr. 24, 2020). Otherwise, application of Exemption 4 would always be prohibited. *Id.*

NTSB regulations provide that, with respect to information obtained during investigations, the agency will "preserve the confidentiality of information to the greatest extent possible." 49 C.F.R. § 831.11(c)(2); *see also* 49 C.F.R. § 801.54 (referencing Exemption 4, and stating that "trade secrets and items containing commercial or financial information that are obtained from a person and are privileged or confidential are exempt from public disclosure.") Although the NTSB may, at its discretion, share information between parties to an investigation, *id.*, parties must acknowledge and sign the Statement of Party Representatives to NTSB Investigation, which outlines prohibitions on the release of information. Ex. 3. "Parties are prohibited from releasing information obtained during an investigation at any time prior to the NTSB's public release of information unless the release is consistent with [a stringent list of] criteria." 49 U.S.C. § 831.13(c). Generally, a party to an investigation may release information

only after coordination with and preapproval by the NTSB, unless the release is limited to within the organization in order to address a safety issue. 49 C.F.R. § 831.13(c), Ex. 3 at 5, 8.

The agency's regulatory limitations on the release of information qualify as assurances of privacy, despite the possibility that the information may be released in limited circumstances to a select group of individuals. *See Friends of Animals*, 2020 WL 2041337, at *11 (agency regulations qualified as assurances of privacy, where they stated that information would be treated as confidential, but could be released in certain circumstances); *cf. Stevens v. United States Dep't of State*, No. Civ. A. 17-2494, 2020 WL 1330653, at *8 (N.D. Ill. Mar. 23, 2020) (course materials remained confidential despite being provided to students, because they were not made available to the public.)

Because the records meet both prongs of the Supreme Court's test for confidentiality outlined in *Food Marketing Institute*, the NTSB properly withheld or redacted them, in accordance with Exemption 4, and is entitled to summary judgment.[7]

**B.    The NTSB properly invoked Exemption 5.**

**1.    The standard for applying Exemption 5.**

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege." *Abtew v. U.S. Dep't of Homeland Sec.*, 808

---

[7] Alternatively, the records identified as B-201 through 211 are also exempt from disclosure under Exemption 5, as discussed in the next section of this brief.

F.3d 895, 898 (D.C. Cir. 2015). The protection from disclosure afforded by the exemption "is

necessary to ensure frank and open discussion and hence efficient governmental operations."

*United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802 (1984); *see also Lahr v. NTSB*, 569

F.3d 964, 979 (9th Cir. 2009). Accordingly, if a record is either "inter-agency" or "intra-agency,"

and qualifies for a litigation privilege (such as the deliberative process privilege or the attorney-

client privilege), it is protected from disclosure. *See EPA v. Mink*, 410 U.S. 73, 85-87 (1973);

*Batton v. Evers*, 598 F.3d 169, 183 (5th Cir. 2010).

> **2.    Information submitted by party representatives to NTSB**
> **investigations qualify as *intra-agency* records.**

This Court and many others have recognized that intra-agency records can include those

"containing comments solicited from nongovernmental parties." *McKinley v. Bd. of Governors of*

*the Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (citing *Nat'l Inst. of Military Justice v.*

*DOD*, 512 F.3d 677, 680, 682 (D.C. Cir.2008)); *accord Wolk Law Firm v. United States NTSB*,

392 F. Supp. 3d 514, 525-26 (E.D. Pa. 2019) (holding that the deliberative process privilege

protected work consultants performed on behalf of the NTSB.) Under the "consultant corollary"

to Exemption 5, "agency records authored by non-agency entities" can be protected "if those

records were solicited by a U.S. agency in the course of its deliberative process." *Department of*

*Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 11 (2001); *accord McKinley*, 647

F.3d at 336; *Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 680, 682 (D.C. Cir. 2008). In

holding this advice covered by Exemption 5, courts have emphasized that: (1) the agencies

sought the outside advice; (2) the advice was not adverse to government interests; and (3) in

providing their expertise, the consultants effectively functioned as agency employees. *See, e.g.,*

*Nat'l Inst. of Military Justice v. DOD*, 512 F.3d 677, 679-80 (D.C. Cir. 2008); *Nat'l Inst. of*

*Military Justice v. DOD*, 404 F. Supp. 2d 325, 345 (D.D.C. 2005); *McKinley*, 647 F.3d at 337-

38; *Electronic Privacy Info. Ctr. v. DHS*, 892 F. Supp. 2d 28, 45-46 (D.D.C. 2012); *United States*

*v. Real Prop. Known & Numbered as 2847 Chartiers Ave. Pittsburgh, Pa*., 142 F.R.D. 431, 434

(W.D. Pa. 1992) ("The fact that, as here, the document was prepared by an outside consultant for

the agency's use, does not adversely affect its status as 'interagency.'")

      As discussed above, the NTSB solicits technical assistance from other organizations and

government agencies that are "uniquely qualified," *Nat'l Institute of Military Justice*, 512 F.3d at

679, to "provide suitable qualified technical personnel to actively assist in an investigation." 49

C.F.R. § 831.11(a). NTSB's investigations benefit when the agency has access to the breadth of

experience and expertise held by organizations whose aircraft, equipment, or operations are

involved in an accident. Ex. 2 ¶¶ 8, 25. NTSB investigators cannot reasonably be expected to

maintain comprehensive knowledge about each of the airframes, engines, systems, components,

and specifications of every civil aircraft flown in the United States. *Id.* ¶ 8. Nor is it reasonable to

expect NTSB investigators to be intimately familiar with the operations and procedures of all

private aircraft operators. *Id.* Thus, NTSB investigators solicit advice, opinions, and

recommendations from party representatives about each aspect of an investigation for which they

can provide suitable technical assistance. *Id.* ¶¶ 9, 15, 25. Party representatives assist the NTSB

IIC on-scene, help facilitate investigative activities throughout the investigation, and provide

input on NTSB's draft reports. In sum, these outside parties help the NTSB IIC understand the

"knotty complexities," *Nat'l Institute of Military Justice*, 512 F.3d at 683, of all aspects of an

aircraft accident investigation, including but not limited to airframe and engine specifications

and performance, operational and maintenance requirements, and pilot performance.

In *Electronic Privacy Information Center v. DHS*, 892 F. Supp. 2d 28, 45-46 (D.D.C. 2012), the district court held that "to be excluded from the exemption," the outside party "must assume a position that is necessarily adverse to the government." *Id*. at 46 (quoting *Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1,14 (2001)). In *Electronic*, the outside party was a contractor providing security scanning equipment to the government with the ultimate goal of expanding its contractual relationship with the government. The court acknowledged that the outside party was seeking a government benefit at the expense of other parties—other companies who sought contracts to provide similar services. *Id.* at 45-46. After discussing the Supreme Court's analysis in *Klamath*, the court ruled, however, that "[s]elf-advocacy is not a dispositive characteristic and does not control Exemption 5's scope." *Id.* Because the outside party's interests were not adverse to the government's interests, the court ruled that the outside party was distinguishable from the Native American tribes in *Klamath* and that documents passed between the government and the outside party met the Exemption 5 threshold. *Id.*

Here, the at-issue advice that party representatives provided to the NTSB is intra-agency communication that the consultant corollary to Exemption 5 covers. The NTSB sought the outside advice, the advice was not adverse to government interests, and the consultants—in providing their expertise—effectively functioned as agency employees. *See, e.g., Nat'l Inst. of Military Justice* 512 F.3d at 679-80; *McKinley,* 647 F.3d at 337-38, *Electronic Privacy Info. Ctr.*, 892 F. Supp. 2d at 45-46; *United States v. Real Prop. Known & Numbered as 2847 Chartiers Ave. Pittsburgh, Pa*., 142 F.R.D. 431, 434 (W.D. Pa. 1992.)

19

Any argument by plaintiffs that the party representatives are self-interested should be disregarded. As an initial matter, "[s]elf-advocacy is not a dispositive characteristic and does not control Exemption 5's scope." *Electronic,* 892 F. Supp. 2d at 45-46. In any event, the parties' participation in the investigation lacks the indicia of self-interest that the Supreme Court considered in *Klamath* to hold that the Indian Tribe plaintiffs there, who were advocating their own interests to an agency, were not consultants. 532 U.S. at 14. First, NTSB investigations are fact-finding proceedings, without adverse parties, that do not assign liability or adjudicate rights. 49 C.F.R. § 831.4(c). Second, legal professionals, claimant or insurer representatives, and individuals directly involved in an accident (to the extent practicable) are not permitted to be party representatives. *Id*. § 831.11(a)(1), (b)(1). Third, party participation is subject to the IIC's control and direction, and to the terms of the "Statement of Party Representative to NTSB Investigation," all to ensure that parties are serving the needs of the NTSB investigation, and not any litigation purpose. 49 C.F.R. §§ 831.8(b), 831.11(a)(4); Ex. 3.

Significantly, in earlier, virtually identical litigation between plaintiff and the NTSB ("the Wolk 2016 Litigation"), this Court rejected plaintiff's argument that Exemption 5 did not cover records containing advice and comments that party representatives to investigations provided to the NTSB. *Wolk Law Firm*, 392 F. Supp. 3d. at 525-26 (holding that the deliberative process privilege protected work performed by consultants on behalf of the NTSB.)

2.   **Litigation privileges cover the records that the NTSB withheld or redacted under Exemption 5.**

a.   **The NTSB properly withheld or redacted attorney-client communications or attorney work-product.**

Exemption 5 protects from disclosure "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *See*

20

*e.g., Mead Data Cent. Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977); *Elec.*

*Privacy Info. Ctr. v. DHS,* 117 F. Supp. 3d 46, 65 (D.D.C. 2015) (finding no actionable question that

redaction was properly exempted under attorney-client privilege, because "the particular portion [of

an e-mail chain] redacted by the Government contains a communication between a DHS employee

and a DHS attorney seeking legal review and advice"). Similarly, Exemption 5 incorporates the

traditional attorney work-product protection, which protects documents prepared by an attorney in

contemplation of litigation. *See, e.g.*, *Media Research Ctr. v. DOJ*, 818 F. Supp. 2d 131, 141 (D.D.C.

2011) (involving government attorneys advising agency); *James Madison Project v. CIA*, 607 F.

Supp. 2d 109, 130 (D.D.C. 2009) (same).

      As shown in the *Vaughn* index, the NTSB redacted, or withheld in full, based on Exemption

5, a few documents that contained legal discussions between NTSB employees and an NTSB

attorney. *See* Ex. 1. In particular, the protected discussions involved an NTSB attorney providing

counsel on whether to release certain records in the public docket or in litigation. *Id.* These

communications fall squarely within the ambit of the attorney-client privilege and were properly

withheld. *Id.* Summary judgment should be granted in the NTSB's favor for these withholdings.

      **b.**    **The NTSB properly withheld or redacted information covered by the deliberative process privilege.**

      Exemption 5 incorporates the deliberative process privilege, the general purpose of which

is to "prevent injury to the quality of agency decisions." *NLRB v. Sears, Roebuck & Co.*, 421

U.S. 132, 151 (1975). Specifically, three policy purposes have been consistently held to

constitute the bases for this privilege: (1) to encourage open, frank discussions on matters of

policy between subordinates and superiors; (2) to protect against premature disclosure of

proposed policies before they are actually adopted; and (3) to protect against public confusion

that might result from disclosure of reasons and rationales that were not in fact ultimately the

21

grounds for an agency's action. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Jordan v. DOJ*, 591 F.2d 753, 772-73 (D.C. Cir. 1978).

The privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866. Such documents "would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." *Id*. Factual information is protected so long as "it reflects an 'exercise of discretion and judgment calls'" and where its exposure would enable the public to examine an agency's deliberative processes. *Bloche v. DOD*, 279 F. Supp. 3d 68, 80 (D.D.C. 2017) (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011)); *accord Agility Pub. Warehousing Co. K.S.C. v. Dep't of Defense*, 110 F. Supp. 3d 215, 222 (D.D.C. 2015); *KDKA-TV v. Thornburgh*, Civil Action No. 90-1536, 1992 U.S. Dist. Lexis 22438, at \*10–11 (D.D.C. Sept. 1992).

      i.      The information the NTSB withheld as deliberative-process-privileged is both *pre-decisional* and *deliberative.*

To be exempt from disclosure under the deliberative process privilege, a record must be both "pre-decisional," in that it was generated before the agency made a decision, and "deliberative," in that it reflects the give-and-take of the consultative process. *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997); *Coastal States*, 617 F.2d at 866; *Judicial Watch, Inc. v. Dep't of the Army*, 435 F. Supp. 2d 81, 88 (D.D.C. 2006).

To show that the withheld documents are pre-decisional, the NTSB need not "identify a specific decision in connection with which a memorandum is prepared . . . [because] agencies

22

are, and properly should be, engaged in a continuing process of examining their policies," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975). Rather, the NTSB need only establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States*, 617 F.2d at 868. A record is pre-decisional "if it precedes, in temporal sequence, the 'decision' to which it relates," *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015), and is generated as part of, and contributes to, a continuing process of agency decision-making. *See, e.g., Access Reports v. DOJ*, 926 F.2d 1192, 1196 (D.C. Cir. 1991); *ACLU of Wash. v. DOJ*, No. 09-0642, 2011 WL 887731, at *5 (W.D. Wash. Mar. 10, 2011); *Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 16 (D.D.C. 2004).

Courts have protected, as "deliberative," material that would expose the opinions, advice, or recommendations offered in the course of agency decision-making. *See, e.g., Elec. Frontier Found. v. DOJ*, 892 F. Supp. 2d 95, 102 (D.D.C. 2012); *Elec. Frontier Found. v. DOJ*, 890 F. Supp. 2d 35, 43-48 (D.D.C. 2012). The privilege "'protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency.'" *Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241, 260 (D.D.C. 2017) (quoting *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)).

Identifying a deliberative process ultimately depends upon the function of the particular agency and the issue being deliberated. *See Coastal States*, 861 F.2d at 867-68 (explaining that memoranda advising a superior on legal strategy would be protected by the deliberative process privilege.) The relevant deliberative process here is the NTSB's process of determining the facts,

23

circumstances, and probable causes of aircraft accidents, and developing safety recommendations designed to prevent future accidents. *See* 49 U.S.C. § 1131(e); 49 C.F.R. § 831.4(a)–(b). To reach these determinations, staff and board members conduct extensive investigations and analyses. The NTSB's discussions and evaluations are deliberative because investigators, in coming to their conclusions, must determine what the facts are, and how those facts contribute to the circumstances and probable causes of accidents. Investigators are presented only with the wreckage and aftermath of an accident. In determining facts, they must "explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny," *Lahr*, 569 F.3d at 979, to the same extent that agency decisionmakers must be free to deliberate policies.

The NTSB withheld in full or redacted under Exemption 5 records that: (1) predate the NTSB's publication of a final report for each accident; and (2) would give insight into the agency's deliberative processes. The attached *Vaughn* index provides detailed descriptions of these records, and how they were generated as part of, contribute to, or reflect the NTSB's accident investigations. *See* Ex. 1. The categories of such records include notes, calculations, accident summaries, draft reports, communications, analyses, and memoranda. *Id.* The records reflect input on: draft reports; preliminary information and thoughts on the causes of the accidents; the potential relevance of certain information to the agency; how information may be used by the agency during the investigations; investigation strategies; and investigators' thought processes. These records thus contain precisely the type of information the deliberative process privilege protects from disclosure. Release of this information could chill frank discussion between NTSB employees and party representatives about possible accident causes and create

24

confusion by disclosing reasons and rationales that were not ultimately the bases for the NTSB's final reports. *See, e.g., Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Jordan v. DOJ*, 591 F.2d 753, 772-73 (D.C. Cir. 1978).

ii.      The deliberative process privilege is not limited to records related to a policy decision.

In the Wolk 2016 Litigation, this Court rejected plaintiff's argument that the deliberative process privilege protected only records related to a policy decision. *Wolk Law Firm*, 392 F. Supp. 3d. at 526. The Court explained that "[s]everal circuit decisions confirm not only that the privilege applies to decisions that are not formally policy, but in particular to investigations of aircraft accidents by various agencies." *Id.* at 526 (citing cases). The Court held that the same types of records at issue here were deliberative and pre-decisional, and that the NTSB properly withheld them pursuant to Exemption 5. *Id.*

Other courts have routinely declined to interpret the deliberative process privilege narrowly, as protecting only documents relating to a policy decision. Instead, these courts have interpreted Exemption 5 to protect records reflecting the agency's "consultative process," *Coastal States*, 617 F.2d at 867, irrespective of whether the records contain recommendations regarding law and policy. *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1119 (9th Cir. 1988) (citing cases.); *see also Urban Air Initiative, Inc. v. EPA*, 271 F. Supp. 3d 241, 260 (D.D.C. 2017).

The NTSB is responsible for establishing the facts, circumstances, and probable causes of aircraft accidents. 49 U.S.C. § 1131(a). Thus, the agency engages in a significant amount of deliberation about the facts of an aircraft accident, and about how to conduct investigations.

25

Whether these topics may be rigidly defined as "policy" questions is irrelevant—they are nonetheless protected by the deliberative process privilege, because the NTSB must be able to have full and frank discussions about fulfilling its investigative mandate, just as a policymaking agency requires such latitude and protection when making its decisions. The deliberative process privilege is intended to protect these "open and frank discussions" among government officials, in order to enhance the quality of agency decisions. *Klamath*, 532 U.S. at 8-9.

iii.      The deliberative process privilege protects factual material.

In the 2016 Wolk Litigation, this Court also rejected plaintiff's argument that the documents the NTSB withheld pursuant to the deliberative process privilege were purely factual, and not subject to the privilege. *Wolk Law Firm*, 392 F. Supp. 3d at 526. The Court explained, "[to] the extent the materials have factual information, they are still protected because they represent agency workers' discretion and judgment calls, for example through the selection, interpretation, or manipulation [of facts] to generate other factual bases for further use." *Id.*

Many other courts have refused to adopt a factual versus deliberative/opinion distinction. *See e.g., Ctr. for Biological Diversity*, 369 F. Supp. 3d at 137 ("To the extent plaintiff is arguing that factual information is categorically excluded from the deliberative process privilege, it is wrong."); *Dudman Communications Corp. v. Dept. of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). In some circumstances, like here, "'the disclosure of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately held privileged." *Ctr. for Biological Diversity*, 369 F. Supp. 3d at 137 (citing *Petroleum Info. Corp. v. DOI*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)). "[T]he privilege serves to protect the deliberative

process itself, not merely documents containing deliberative material." *Ctr. for Biological Diversity*, 369 F. Supp. 3d at 137 (citing *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993)).

    Factual information should be examined "in light of the policies and goals that underlie" the privilege and in "the context in which the materials are used." *Wolfe v. HHS*, 839 F.2d 768, 774 (D.C. Cir. 1988); *accord Ancient Coin Collectors Guild v. United States Department of State,* 641 F.3d 504, 513 (D.C. Cir. 2011) ("the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process."); *Ryan v. DOJ*, 617 F.2d 781, 790 (D.C. Cir. 1980) (citing *EPA v. Mink*, 410 U.S. 73, 92 (1973) ("[F]actual segments are protected from disclosure as not being purely factual if the manner of selecting or presenting those facts would reveal the deliberate process, or if the facts are inextricably intertwined with the policy-making process. The Supreme Court has substantially endorsed this standard".)

    Of relevance here, courts have held the following records containing facts as within the scope of the deliberative process privilege: (1) reports that constitute the interpretation of technical data, *Parke, Davis & Co. v. Califano*, 623 F.2d 1 (6th Cir. 1980); *Reliant Energy Power Generation, Inc. v. F.E.R.C.*, 520 F. Supp 2d 194, 205 (D.D.C. 2007); and (2) the selection of facts out of a larger group. *Montrose Chem. Corp. v. Train*, 491 F.2d 63 (D.C. Cir. 1974).

    The NTSB's *Vaughn* index describes the content of each record withheld or redacted as deliberative-process-privileged under Exemption 5—identifying the date, time and creator (if known), and additional information to supplement the arguments in this motion. Additionally,

Mr. Lebaron's declaration provides background and context about NTSB accident investigations and the types of records that are generated in those investigations. Through its motion, *Vaughn* index, and declaration, defendant has fully detailed how the information contained within each document is intertwined with and reflects the agency's preliminary positions, recommendations, and opinions, all of which are covered by the deliberative process privilege. *Coastal States*, 617 F.2d at 866. Because the NTSB has properly withheld or redacted documents pursuant to Exemption 5, summary judgment should be granted in the NTSB's favor.

### C.      The NTSB properly invoked Exemption 6.

Exemption 6 permits an agency to withhold all information in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The concept of privacy encompasses that which is inherently private, such as dates of birth and marriage, as well as the intimate and potentially embarrassing. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 763; *see also Painting & Drywall Work Pres. Fund, Inc. v. HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991)*.* It includes an "individual's control of information concerning his or her person." *Reporters Comm. for Freedom of the Press*, 489 U.S. at 763.

As the Supreme Court has observed, Exemption 6 is designed to protect "individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Washington Post Co.,* 456 U.S. 595, 599 (1982). "[T]he protection of an individual's privacy 'surely was not intended to turn upon the label of the file which contains the damaging information.'" *Id*. at 599-603 (citing H.R. Rep. No. 89-1497, at 11 (1966); S. Rep. No. 89-813, at 9 (1965); S. Rep. No. 88-1219, at 14 (1964)). The Supreme Court has therefore interpreted the term "similar files" in the statute broadly and has applied Exemption

28

6 to any information that "applies to a particular individual," regardless of the type of
government file in which the information may be contained. *Washington Post Co.,* 456 U.S. at
602; *see also Pellegrino v. U.S. Transportation Security Admin.*, No. 09-5505, 2015 WL
2124911, at *8 (E.D. Pa. May 6, 2015).

Under Exemption 6, the court must determine whether disclosure "would constitute a
clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). In making this
determination, the court must "balance the public interest in disclosure against the privacy
interest protected by the exemption." *Berger v. IRS*, 288 F. App'x 829, 832 (3d Cir. 2008); *see
Rose*, 425 U.S. at 372; *McDonnell*, 4 F.3d at 1251-52. The only relevant public interest is
whether disclosure "sheds light on an agency's performance of its statutory duties" or otherwise
lets citizens know "what their government is up to." *Reporters Comm. for Freedom of the Press*,
489 U.S. at 773; *see also Berger*, 288 F. App'x at 832. This public interest "is not fostered by
disclosure of information about private citizens that is accumulated in various governmental files
but that reveals little or nothing about an agency's own conduct." *Reporters Comm. for Freedom
of the Press*, 489 U.S. at 773.

As the attached *Vaughn* index details, the NTSB withheld in full or redacted, under
Exemption 6, "personnel, medical and similar files" containing credit card numbers, telephone
numbers, addresses, dates of birth, medical information, and sensitive photographs. Ex. 1. By
their very nature, these files fall within the purview of the exemption. Balancing the cognizable
interests, these documents shed no light on the NTSB's performance of its duty to investigate the
accidents, and their release would have a significant impact on individuals' privacy.

29

Plaintiff has represented that it does not intend to object to the NTSB's redaction of personally identifying information such as credit card numbers, addresses, certificate numbers, driver's license numbers, dates of birth, email addresses, telephone numbers, and passwords. Thus, the agency does not address these redactions in this motion and requests summary judgment in its favor. The agency nevertheless reserves the right to support these redactions in its reply brief if necessary.

As noted earlier, the NTSB has provided plaintiff with records impacting privacy in reliance upon plaintiff's September 29, 2020 letter identifying its clients. The agency, however, has withheld or redacted "personnel, medical and similar files" relating to individuals who are not represented by plaintiff, such as: (1) autopsy and other medical reports for the pilot and another accident victim; (2) a pilot death certificate; (3) photographs of the deceased pilot; (4) records containing medical information; and (5) videos showing victims' injuries and/or describing their injuries. The subjects of these files and their representatives clearly have a privacy interest in the "control of information concerning [the victim's] person." *Reporters Comm. for Freedom of the Press*, 489 U.S. at 763. Moreover, these records reveal little about the NTSB's conduct. *See id.* In particular, the withheld autopsies were performed by state or local jurisdictions. *See* 49 U.S.C. § 1134(f). An autopsy performed by a state or local jurisdiction tells the public nothing additional about what the NTSB "is up to." *See Reporters Comm. for Freedom of the Press*, 489 U.S. at 773.

The NTSB withheld medical case reviews in full. These documents are being withheld in the first instance pursuant to Exemption 5, as deliberative-process-privileged. Any reliance by the NTSB on Exemption 6 is secondary and results from the medical nature of the documents.

Ultimately, Exemption 5 protects these documents from disclosure because they are analytical documents that contain analyses and recommendations from FAA[8] physicians to NTSB investigators regarding medical aspects of the investigation. The documents are at the heart of the NTSB's deliberative process establishing the facts, circumstances, and probable causes of aircraft accidents. 49 U.S.C. § 1131(a). Nonetheless, just as with the autopsy reports, the individuals who plaintiff does not represent and their surviving family members clearly have a privacy interest in their medical information, *Reporters Comm. for Freedom of the Press*, 489 U.S. at 763, and their release "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

Accordingly, the NTSB's decision to withhold or redact these documents based on Exemption 6 was proper, and summary judgment should be granted in its favor.

## IV.   THE NTSB IS ALSO ENTITLED TO SUMMARY JUDGMENT AS TO THE BATES/CULLEN ACCIDENT INVESTIGATION.

The allegations in the Amended Complaint mentioning the Bates/Cullen accident do not specifically aver any FOIA violation. Rather, the allegations refer to plaintiff's now dismissed claims for obstruction of justice and violation of 49 C.F.R. § 837 in Counts I and II. *See* Am. Compl. Doc. # 9 ¶¶ 30-50; 139-158. When introducing the "FOIA requests at issue," plaintiff avers that "[s]everal of these requests have been subject to unreasonable delay." *Id.* ¶ 29. Plaintiff does not, however, allege that the NTSB's responses to *each* of its FOIA requests were untimely or otherwise improper. Specifically, in Count III, which asserts a violation of the FOIA,

---

[8] As detailed in defendant's motion, *Vaughn* index, and declaration of Timothy LeBaron, the FAA was a party providing technical assistance and consultation in each NTSB investigation at issue.

plaintiff does not identify the Bates/Cullen FOIA request (No. 131) in its enumeration of requests at issue. *Id.* ¶ 126.

As averred in the Amended Complaint, plaintiff submitted a FOIA request to the NTSB for records relating to the Bates/Cullen accident on February 11, 2019. Am. Compl. ¶ 47. The NTSB denied the request on March 5, 2019 because the NTSB investigation and a parallel law enforcement investigation were pending. *Id.* ¶ 48 and Ex. A10. The NTSB denied plaintiff's appeal for the same reason on May 2, 2019. *Id.* ¶ 49 and Ex. A24. The agency further informed plaintiff that after the conclusion of the investigation, if it sought records in addition to what was released on the public docket, plaintiff could resubmit a FOIA request. *Id.* at Ex. A24.

The public docket for the Bates/Cullen investigation was released on May 11, 2019. Ex. 2 ¶ 30. The docket contains documentation supporting the NTSB's findings and conclusions, including an Airworthiness Factual Report, an Aircraft Performance Study, and a Video Study. *Id.* The NTSB published the final report for this accident on July 13, 2020. *Id*. ¶ 31. In the past, when plaintiff sought records in addition to what the NTSB published on its website at the conclusion of an investigation, plaintiff submitted additional FOIA requests—as it did here with the Chase, Gentry, and Torres accidents. Doc. # 17 ¶¶ 13-22. Presumably, plaintiff is satisfied with the Bates/Cullen investigative materials made available to it on the NTSB website five months ago, because plaintiff has not submitted another FOIA request to the NTSB seeking more records.

Because the Amended Complaint does not assert a FOIA claim against the NTSB for the Bates/Cullen investigation, and plaintiff has not sought records in addition to what the NTSB has published on its website, summary judgment should be granted in favor of the NTSB.

**V.      CONCLUSION**

For all the reasons set forth above, defendant NTSB respectfully requests the Court to grant NTSB's motion for summary judgment, to enter judgment in NTSB's favor and against the plaintiff, and to dismiss the Amended Complaint.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney


/s/ Gerald B. Sullivan, for
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division


/s/ Stacey L. B. Smith
STACEY L. B. SMITH
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106


Dated:  October 30, 2020

**Table of Exhibits**

1. Index of Withheld Records
2. Declaration of Tim LeBaron
3. Statement of Party Representative

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I caused a true and correct copy of the foregoing

Motion, which has been electronically filed and is available for viewing and downloading from

the Court's ECF system, to be served upon the following:

    Cynthia M. Devers, Esq.
    The Wolk Law Firm
    1710-12 Locust Street
    Philadelphia, PA 19103
    cdevers@airlaw.com

    *Attorney for Plaintiffs*

                /s/ Stacey L. B.Smith
                STACEY L. B. SMITH
                Assistant United States Attorney

Dated:  October 30, 2020